## GARVELINK v THE DETROIT NEWS

Docket No. 141515. Submitted January 18, 1994, at Detroit. Decided September 6, 1994, at 9:25 A.M. Leave to appeal sought.

Roger Garvelink, who served as superintendent of the Birmingham public schools, brought an action in the Oakland Circuit Court against The Detroit News and Chuck Moss, alleging that he was defamed in a column written by Moss and published in the editorial pages of The Detroit News. Under the heading " 'Punishment Cuts' Work Like a Charm," the column related an interview by Moss of "local Supt. Gravelhead" in which Gravelhead indicated that the elimination of certain school programs following the electorate's rejection of a millage increase ensures its passage in a subsequent election, and that education professionals like him, and not parents, know what is best for students. The court, Robert C. Anderson, J., denied summary disposition for the defendants. The defendants appealed by leave granted.

The Court of Appeals *held:*

Because the column cannot reasonably be interpreted by a reader as stating actual facts about the plaintiff, given its satirical tenor, humorous tone, and appearance in the biased and opinion-filled editorial pages of the newspaper, it does not contain falsehood upon which the plaintiff can maintain an action for defamation.

Reversed and remanded for entry of summary disposition for the defendants.

1. Libel and Slander — Public Officials or Figures.

A public official or figure who brings an action for defamation must prove that the publication was a defamatory falsehood

### References

Am Jur 2d, Libel and Slander, §§ 25, 173-175, 205, 290, 296, 297, 299, 301.

Necessity and sufficiency of plaintiff's allegations as to falsity in defamation action. 85 ALR2d 460.

Libel and slander: what constitutes actual malice, within federal constitutional rule requiring public officials and public figures to show actual malice. 20 ALR3d 988.

Libel and slander: defamation by cartoon. 52 ALR4th 424.

and that the statement was made with actual malice, i.e., with knowledge that it was false or with reckless disregard of whether it was false or not.

2. LIBEL AND SLANDER — PUBLIC OFFICIALS — PARODIES, POLITICAL CARTOONS, AND SATIRE.

Statements about a public official contained in a parody, political cartoon, or satirical editorial that cannot reasonably be interpreted by a reader as stating actual facts about the official are protected by the First Amendment as public debate and are not actionable for defamation (US Const, Am I).

*Cross Wrock, P.C.* (by *Jack O. Kalmink* and *Dirk H. Beckwith*), for the plaintiff.

*Butzel Long* (by *James E. Stewart, Leonard M. Niehoff,* and *Kevin F. O'Shea*), for the defendants.

Before: JANSEN, P.J., and McDONALD and G. M. HOCKING,* JJ.

JANSEN, P.J. Defendants appeal by leave granted from a May 31, 1991, order of the Oakland Circuit Court denying their motion for summary disposition pursuant to MCR 2.116(C)(8). We reverse.

Plaintiff Roger Garvelink was the superintendent of the Birmingham school system from March 1978 through June 1990. In March 1989, the Birmingham voters were presented with a millage proposal for a $65 million bond increase. The proposal produced some controversy, apparently stemming from a redistricting decision the school board made a year earlier, and the millage was defeated. Because of the millage defeat, plaintiff and others made a number of budget cuts amounting to $7 million. Plaintiff then sought to make further cuts of $5 million from the following year's budget.

On June 3, 1989, The Detroit News printed an

---

* Circuit judge, sitting on the Court of Appeals by assignment.

editorial column, which appeared on the editorial page, by Chuck Moss under the heading, " 'Punishment Cuts' Work Like a Charm." In the column, Moss described an "interview" with "local Supt. Roger Gravelhead." In the interview, Dr. Gravelhead boasted about using the budget cuts to punish voters for rejecting the millage proposal and stated that educational professionals knew more about what students needed than the parents did.[1]

---

[1] In its entirety, the column reads as follows:

A lot of school boards and district leaderships are under fire these days. Without even counting the ruined, collapsed Detroit system, you can see millages croaking, school boards being yanked and supervisors queueing up for resume services just as Leningraders do for toilet paper. For the big scoop, I sat down with local Supt. Roger Gravelhead.

"Your millage went down, Doc," I said. "What now?"

"Time for us educational professionals to provide decisive leadership," he said sternly. "It's time for punishment cuts."

"Punishment cuts?"

"Yes, punishment cuts." He folded his soft hands across his well-cut suit. "Just because these foolish voters defeated a millage, don't think we professionals are down! There's a time-honored strategy for putting the great unwashed in their place."

"Punishment cuts?"

"Sure thing." He laughed. "Within two weeks, you regretfully announce a new 'money-saving budget': no more sports, no more band, drama, art, music, study hall. All extracurricular activities are axed. Bus service is severely curtailed. Support staffs are reduced and their unions trashed. Of course, essential administrative personnel like me and my pals stay safe, nor do we cancel vital expenditures such as the new carpet for the Administration Building. Just things that impact the voters."

"Does this work?"

"Like a charm!" He rubbed his hands together. "We make the kids hurt and the parents howl. When they come back screaming, we just shake our heads. 'Too bad, chums. The next millage will be on the calendar in six months.' I guarantee, the electorate will be fighting for the privilege to raise its own taxes!"

"Gee Doc, this sounds, well, cynical."

"Not at all," Dr. Gravelhead said. "Educational professionals have a duty to manage the system in the best interests of the children . . . and who knows better what your kids need than educational professionals?"

Plaintiff filed his complaint on June 1, 1990, alleging defamation. Defendants moved for summary disposition pursuant to MCR 2.116(C)(8) on April 10, 1991, but the trial court denied the motion. This Court then granted defendants' application for leave to appeal on October 22, 1991.

On appeal, the trial court's grant or denial of summary disposition is reviewed de novo, because this Court must review the record to determine whether the moving party is entitled to judgment as a matter of law. *Adkins v Thomas Solvent Co*, 440 Mich 293, 302; 487 NW2d 715 (1992). MCR 2.116(C)(8) permits summary disposition in favor of a defendant when the plaintiff has failed to state a claim upon which relief can be granted. A motion pursuant to MCR 2.116(C)(8), therefore, determines whether the plaintiff's pleadings allege a prima facie case. *Radtke v Everett*, 442 Mich 368, 373;

---

"The parents," I ventured. "Some of them are professionals. Lawyers, doctors . . . ."

"Parents!" he barked. "Parents are the last people we rely on." He handed me a paper. "Like the Birmingham Public Schools say, parents are 'emotional,' 'diffused,' 'submissive,' 'helpless,' individualized,' and concerned 'with the here and now.' While we professionals are 'objective,' 'dominant,' 'universal,' and 'focus on the whole class or group.' Parents are just happy-go-lucky big kids. It's our duty to make the parents understand that we professionals know what's best for their children. We need to give them the wider perspective."

"By punishing the electorate."

He smiled. "Let's just call it re-education. We feel the voters just didn't UNDERSTAND the issues involved."

"Maybe they were trying to send you a message, whup you upside the head and get your attention. You've made some questionable moves over the years . . . spent bad money, sold needed buildings. At a time of budget crisis you have an $80,000 community affairs director while the city manager only makes $60,000. Maybe the voters want to teach you a lesson."

"Teaching without a license?" Gravelhead laughed. "They're not in the union."

"In union is strength, I recall."

"RECALL?" He gasped. "Please! Not that word! It's, it's . . . ."

"Unprofessional?"

501 NW2d 155 (1993). A court may grant a motion pursuant to MCR 2.116(C)(8) only where the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify recovery. *Wade v Dep't of Corrections,* 439 Mich 158, 163; 483 NW2d 26 (1992).

Our review is also governed by the Supreme Court's pronouncements in defamation cases implicating the First Amendment. Courts must make an independent examination of the record to assure that the judgment does not constitute a forbidden intrusion on the field of free expression. *New York Times Co v Sullivan,* 376 US 254, 285; 84 S Ct 710; 11 L Ed 2d 686 (1964); *Bose Corp v Consumers Union of United States, Inc,* 466 US 485, 499; 104 S Ct 1949; 80 L Ed 2d 502 (1984); *Locricchio v Evening News Ass'n,* 438 Mich 84, 110; 476 NW2d 112 (1991). Where a public official or public figure is involved in a defamation case, the public official or public figure must prove that the publication was a defamatory falsehood and that the statement was made with actual malice, that is, that it was made with knowledge that it was false or with reckless disregard of whether it was false or not. *Sullivan, supra* at 279-280; *Curtis Publishing Co v Butts,* 388 US 130; 87 S Ct 1975; 18 L Ed 2d 1094 (1967). In the instant case, it is undisputed that plaintiff is a public official.

For both public officials and public figures, a showing of actual malice is subject to a clear and convincing standard of proof. *Gertz v Robert Welch, Inc,* 418 US 323, 342; 94 S Ct 2997; 41 L Ed 2d 789 (1974). The question whether the evidence in a defamation case is sufficient to support a finding of actual malice is a question of law. *Harte-Hanks Communications, Inc v Connaughton,* 491 US 657, 685; 109 S Ct 2678; 105 L Ed 2d 562 (1989).

Keeping these principles in mind, the Supreme Court has further recognized constitutional limits on the type of speech that may be the subject of defamation actions. In cases where the statements cannot reasonably be interpreted as stating actual facts about the individual, those statements are protected under the First Amendment. *Milkovich v Lorain Journal Co,* 497 US 1, 20; 110 S Ct 2695; 111 L Ed 2d 1 (1990); *Hustler Magazine v Falwell,* 485 US 46; 108 S Ct 876; 99 L Ed 2d 41 (1988); *Letter Carriers v Austin,* 418 US 264; 94 S Ct 2770; 41 L Ed 2d 745 (1974); *Greenbelt Cooperative Publishing Ass'n v Bresler,* 398 US 6; 90 S Ct 1537; 26 L Ed 2d 6 (1970). Defendants argue that there was no defamatory falsehood because the column could not reasonably be interpreted as stating actual facts about plaintiff and, therefore, the issue of actual malice need not be considered.

We are required to conduct an independent review of the column and pleadings to ensure against the forbidden intrusion on the field of free expression and to examine the statements and the circumstances under which they were made to determine whether they are of a character that the principles of the First Amendment protect. See *Sullivan, supra* at 285; *Locricchio, supra* at 110. Therefore, it is the function of this Court to review the column to determine whether it could reasonably be understood as describing actual facts about plaintiff. Although plaintiff argues that there is a material factual dispute for the jury to determine, that is the appropriate standard for a motion for summary disposition pursuant to MCR 2.116(C) (10), but this case is before us by way of a motion pursuant to MCR 2.116(C)(8). Furthermore, where there are First Amendment implications such as whether a satirical column in a newspaper is capable of bearing a defamatory falsehood by im-

plying the assertion of undisclosed facts, this is a question of law and the court must consider whether the alleged defamatory expression could reasonably be understood as describing actual facts about the plaintiff. See *Hoppe v Hearst Corp,* 53 Wash App 668; 770 P2d 203 (1989).

After reviewing the column and the pleadings, we hold as a matter of law that the column cannot reasonably be interpreted as stating actual facts about plaintiff and it is, therefore, protected speech. The tenor of the column is satirical. *The Random House College Dictionary* (1988) defines satire as "the use of ridicule in exposing, denouncing, or deriding vice, folly, etc." and "a literary composition, in verse or prose, in which human folly, vice, etc. are held up to scorn, derision, or ridicule." Similarly, a lampoon is a form of satire, "often political or personal, characterized by the malice or virulence of its attack." *Id.* As the Supreme Court noted in *Falwell, supra* at 54:

> . . . The appeal of the political cartoon or caricature is often based on exploitation of unfortunate physical traits or politically embarrassing events— an exploitation often calculated to injure the feelings of the subject of the portrayal. The art of the cartoonist is often not reasoned or evenhanded, but slashing and one-sided.

Thus, in this area of parodies, political cartoons, and satirical columns, especially involving public officials, while the tenor of the column may be caustic or even vicious, the Supreme Court has clearly recognized that "[t]he sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those who are 'intimately involved in the resolution of important public questions . . . .' " *Falwell, supra* at 51.

The column appeared on the editorial page, uses an obviously fictitious name (Gravelhead), and presents a mock interview. No reasonable reader would believe that a school superintendent would have actually made the comments in the column. The column's tone is humorous and the writing style suggests that the column did not concern actual events. The column was written after controversial budget cuts had been made and after a proposed school millage increase recently had been defeated. Thus, in the context of a controversial school millage proposal, school budget cuts, and because the column appeared on the editorial page, a reader is prepared for exaggerations, mischaracterizations, and biases of the writer. *Hoppe, supra.*

Also of importance, the column appeared on the editorial page, where a reader expects to find the opinions and biases of the individual writers. The appearance on an editorial page clearly indicates to any reader that the opinions of the writer will be reflected in the column as opposed to only facts. This column did not appear in the general news articles section and is therefore easily distinguishable as opinion-writing because of its appearance on the editorial page. We emphasize that the appearance of the column on the editorial page, where a reader expects to find the opinions and biases of the writer, is important and may be considered even though this case is before us by way of a motion for summary disposition pursuant to MCR 2.116(C)(8). In *Moldea v New York Times Co,* — US App DC —; 22 F3d 310 (1994), the court upheld a grant of summary judgment in favor of the New York Times before either party had begun discovery. The court specifically noted that the statements at issue were made in the context of a book review, and that this context could be consid-

ered in evaluating whether the challenged statements were defamatory. *Id.* at —. The importance of considering the context of the challenged statements was also addressed in *Phantom Touring, Inc v Affiliated Publications,* 953 F2d 724 (CA 1, 1992). In *Phantom Touring,* the court held that a newspaper theater column was not actionable in part because the context of the column was such that the language could not reasonably be interpreted as stating actual facts about the appellant's honesty. The court stated that a theater column is the type of article generally known to contain opinionated writing more than a typical news report. *Id.* at 729.

The column in the instant case is obviously satire intended to criticize the school budget cuts, which was a controversial issue at the time. Further, the column contains "the sort of loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining" that this was an actual interview with plaintiff. *Milkovich, supra* at 21. The column, which appeared on the editorial page, clearly contains language intended to be the author's opinion about the school budget cuts, and a reasonable reader would understand that the author was conveying an opinion about a controversial subject at that time rather than relating an actual interview with plaintiff. Thus, there can be no false statement of fact because, in its context, the column cannot reasonably be interpreted as stating actual facts about plaintiff. Therefore, even if the writer is motivated by hatred or ill-will, the column is still protected in the area of public debate concerning public officials. *Falwell, supra* at 53.

No further factual development could possibly justify a right of recovery because the column

cannot be understood as stating actual facts about plaintiff or understood as being an actual interview with plaintiff and is, therefore, not defamatory as a matter of law. Accordingly, the trial court erred in denying defendants' motion for summary disposition.

Reversed and remanded for entry of an order of summary disposition in defendants' favor. We do not retain jurisdiction.