FAXON v MICHIGAN REPUBLICAN STATE CENTRAL COMMITTEE

Docket No. 209786. Submitted September 13, 2000, at Detroit. Decided
    January 30, 2001, at 9:10 A.M. Leave to appeal sought.

    Jack Faxon, a former state representative and senator, brought an
        action in the Oakland Circuit Court against the Michigan Republi-
        can State Central Committee, seeking damages for alleged defama-
        tory statements concerning the plaintiff contained in a brochure
        distributed by the defendant to registered voters during the plain-
        tiff's 1990 reelection campaign. The brochure was allegedly
        intended to inform voters of the plaintiff's alleged misuse of legisla-
        tive immunity in two instances: to avoid a civil lawsuit and to avoid
        a speeding ticket. With respect to the civil lawsuit, the brochure
        asserted that the plaintiff had sold a fake art object to an art collec-
        tor and that when the collector had sued the plaintiff, the plaintiff
        had resisted the suit by asserting legislative immunity. In bringing
        his defamation action, the plaintiff alleged factual inaccuracies in
        the brochure concerning the events surrounding the sale and the
        subsequent litigation relating to the sale. When a mediation evalua-
        tion was returned for an amount that was within the jurisdictional
        limit of the district court, the circuit court remanded the matter to
        the 51st District Court, where, following a trial, a jury returned a
        verdict for the plaintiff, awarding both damages and punitive dam-
        ages. The district court, Kenneth H. Hempstead, J., denied the
        defendant's motion for a new trial, judgment notwithstanding the
        verdict, or remittitur. The defendant appealed, and the circuit
        court, Gene Schnelz, J., affirmed the verdict and judgment of the
        district court. The defendant appealed by leave granted.

        The Court of Appeals held:

        1. In addressing defamation claims, appellate courts must make
        an independent examination of the record to ensure against forbid-
        den intrusions into the field of free expression. In this case, the pri-
        mary question to be answered on appeal is whether the evidence
        adduced at trial was sufficient to support a finding of actual malice,
        which is a question of law that is reviewed de novo.

        2. Because at the time the brochure was published the plaintiff
        was a state senator seeking reelection, he is deemed to be a public
        official or public figure. Accordingly, the plaintiff had to satisfy a

special standard of proof to succeed with his defamation claim: he had the duty to prove with clear and convincing evidence that the publication was false and was a product of actual malice. Actual malice in the legal context of a defamation action has a particularly narrow meaning: it means that the injurious falsehood was made knowing that it was false or made with reckless disregard for whether it was true. Ill will, spite, or even hatred, standing alone, does not amount to actual malice. Reckless disregard is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the publisher, in fact, entertained serious doubts concerning the truth of the statements published.

3. The evidence admitted at trial concerning malice fell far short of the clear and convincing showing of the actual malice required to support a defamation claim. The record is devoid of evidence that the defendant, at the time of publication, had knowledge that any of the statements in the brochure were false. The person who was the defendant's executive director at the time the brochure was published testified that at the time of publication he had no knowledge that the information in the brochure was false, that the information had come from a variety of news articles, and that he had no reason to doubt the truth of contents of those articles. An employee of the consulting firm that published the brochure for the defendant testified that he did not know at the time of publication that the information contained in the brochure was false. Further, there was no clear and convincing evidence that the defendant published the brochure with reckless disregard of whether the statements were false. The evidence presented did not establish that the defendant published the brochure with a high degree of awareness of probable falsity, that the defendant entertained serious doubts concerning the truth of the publication, or that the defendant failed to investigate the information in a purposeful attempt to avoid learning the truth. Accordingly, the plaintiff's proofs failed to show actual malice by the defendant.

4. Although it has not been settled as a matter of federal constitutional law whether the actual malice standard is applicable where a defendant is not a member of the media, as a matter of state statutory law and case law precedent, the actual malice standard is applicable in this case even though the defendant is not a member of the media.

5. Although substantial arguments can be made concerning the wisdom of applying the actual malice standard in circumstances like this, a state intermediate appellate court lacks the authority to change the well-defined constitutional scheme set forth in control-

ling precedent of the United States Supreme Court. Accordingly, because the plaintiff at trial failed to demonstrate actual malice by clear and convincing evidence, the order of the circuit court must be reversed, and the judgment of the district court must be vacated.

Circuit court order reversed; district court judgment vacated.

1. LIBEL AND SLANDER — APPEAL — STANDARD OF REVIEW.

Whether evidence sufficient to support a finding of actual malice was presented in a defamation action is a question of law that is reviewed de novo on appeal.

2. LIBEL AND SLANDER — PUBLIC FIGURES — BURDEN OF PROOF — ACTUAL MALICE — RECKLESS DISREGARD.

A public official or public figure who brings a defamation action has the burden of proving by clear and convincing evidence that the allegedly defamatory publication was false and was a product of actual malice; actual malice in this specific legal context means that an injurious falsehood was made knowing that it was false or made with reckless disregard for whether it was true; reckless disregard is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the publisher, in fact, entertained serious doubts concerning the truth of the statements published.

3. LIBEL AND SLANDER — PUBLIC FIGURES — BURDEN OF PROOF — ACTUAL MALICE

A public official or public figure who brings a defamation action in Michigan is required to show that the defamation was made with actual malice even where a defendant is not a member of the media (MCL 600.2911[6]; MSA 27A.2911[6]).

*Neal Bush* and *Klimaszewski & Street* (by *Barbara A. Klimaszewski*), for the plaintiff.

*Foster, Swift, Collins & Smith, P.C.* (by *Eric E. Doster* and *James M. Alexander*) and *Bopp, Coleson & Bostrom* (by *James Bopp, Jr.* and *Barry A. Bostrom*), for the defendant.

Before: WHITBECK, P.J., and FITZGERALD and MARKEY, JJ.

PER CURIAM. In this defamation action, defendant, Michigan Republican State Central Committee, appeals by leave granted the circuit court's orders affirming the district court judgment in favor of plaintiff, Jack Faxon, and denying the committee's motion for reconsideration. We reverse the circuit court order affirming the district court judgment and vacate the judgment entered on the jury verdict in favor of Faxon.

### I. BASIC FACTS AND PROCEDURAL HISTORY

Faxon is a former state legislator who served in the Michigan House of Representatives and Michigan Senate from 1964 through 1994. The statements giving rise to this defamation action were published in a brochure, prepared for the committee by a political consulting firm, that was distributed to about 30,000 registered voters shortly before the November 1990 election in which Faxon was running for reelection to the Senate. The brochure was allegedly intended to inform voters of Faxon's alleged misuse of legislative immunity[1] in two instances: to avoid a civil lawsuit and to avoid a speeding ticket.[2] However, referring to

---

[1] See Const 1963, art 4, § 11 ("Except as provided by law, senators and representatives shall be privileged from civil arrest and civil process during sessions of the legislature and for five days next before the commencement and after the termination thereof. They shall not be questioned in any other place for any speech in either house."); see also MCL 600.1831(3); MSA 27A.1831(3), before its repeal by 1984 PA 29, § 1 ("civil process shall not be served on any senator or representative during sessions of the legislature and for 15 days next before the commencement and after the end of each session.").

[2] In 1981, Dr. Richard Golden, an art collector to whom Faxon had sold several items, sued Faxon. Faxon invoked a constitutional right to legislative immunity when he was served with process while the Legislature was in session. See *Golden v Faxon*, 152 Mich App 171; 393 NW2d 550 (1983).

the civil suit,[3] the committee's brochure also asserted that a "disappointed art collector" paid Faxon "over $13,000 for what he thought was a Ming vase." In reference to this piece of art, this brochure exclaimed in a headline, "Ming, schming!" The brochure then stated that Faxon "fancies himself as an art expert," that he had told the art collector that the vase was from the Ming Dynasty, that the vase actually "was a fake," and that Faxon had again taken the stance that the art collector could not sue him because he was a state legislator. Despite the brochure, Faxon was reelected.

Faxon then sued the committee for defamation in the circuit court, alleging that he had sold a bowl, not a vase, for $4,500, not $13,000. When the price of that bowl was added to five other items that he had sold, the total was $13,200. He eventually allowed the buyer to return the bowl and two other items, refunding $12,500. The circuit court remanded this case to the district court after mediation resulted in a recommended award within the district court's jurisdiction. The jury in the district court returned a verdict in favor of Faxon for $75,000 in compensatory damages and $75,000 in punitive damages. The committee appealed to the circuit court, which affirmed the jury's verdict.

After the circuit court denied reconsideration of its decision, this Court granted the committee leave to appeal. At issue in this appeal is whether the district court erred in denying the committee's motion for

The lawsuit was dismissed and refiled when the Legislature was not in session. The case was later settled. In addition, in 1983, Faxon received a speeding ticket, which was allegedly dismissed after he invoked legislative immunity.

[3] Evidently, this was the *Golden* case, see footnote 2, *supra*.

judgment notwithstanding the verdict[4] because Faxon failed to prove that the committee acted with "actual malice," as that term of art is used in free speech cases, when it published the brochure.

## II. STANDARD OF REVIEW

Faxon attempts to reduce the standard of review we apply to this issue to determining whether the circuit court abused its discretion in affirming the judgment and award that resulted from the district court action. The committee, however, asserts that this Court must apply what is, in effect, review de novo of the judgment in the district court because there was insufficient evidence to support Faxon's defamation claim. We agree with the committee on this point. "When addressing defamation claims, appellate courts must make an independent examination of the record to ensure against forbidden intrusions into the field of free expression." *Kevorkian v American Medical Ass'n*, 237 Mich App 1, 5; 602 NW2d 233 (1999); see also *Rouch v Enquirer & News of Battle Creek (After Remand)*, 440 Mich 238, 249, 258; 487 NW2d 205 (1992) (applying independent review). This review de novo is especially pertinent in this case because, in a defamation action, whether the evidence is sufficient to support a finding of actual malice is a question of law, and we review questions of law de novo. See *Burba v Burba (After Remand)*, 461 Mich 637, 647;

---

[4] Neither party places its arguments in a procedural framework. That is, both parties fail to identify which decision the district court made was purportedly erroneous. However, we infer from the substance of their arguments that the committee is challenging the district court's decision to deny its motion for judgment notwithstanding the verdict.

610 NW2d 873 (2000); *Garvelink v Detroit News*, 206 Mich App 604, 608; 522 NW2d 883 (1994).

### III. PROOF OF ACTUAL MALICE

As the committee points out, Faxon, as a state senator seeking reelection, was a public official or public figure at the time it published the brochure. See, generally, *Herbert v Lando*, 441 US 153, 156; 99 S Ct 1635; 60 L Ed 2d 115 (1979). In practical terms, this meant that Faxon had to satisfy a special standard to succeed with his defamation[5] claim. See *Milkovich v Lorain Journal Co*, 497 US 1, 14-15; 110 S Ct 2695; 111 L Ed 2d 1 (1990). This special standard entails proving with clear and convincing evidence that the publication was false and a product of actual malice, meaning that the injurious falsehood was made knowing that it was false or with reckless disregard for whether it was true. See *Garvelink, supra* at 608; *Kevorkian, supra* at 9; see also MCL 600.2911(6); MSA 27A.2911(6). Actual malice in this specific legal context has a particularly narrow meaning. See *Harte-Hanks, Inc v Connaughton*, 491 US 657, 667; 109 S Ct 2678; 105 L Ed 2d 562 (1989).

> "[I]ll will, spite or even hatred, standing alone, do not amount to actual malice. 'Reckless disregard' is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the publisher in fact entertained serious doubts concerning the truth of the statements published." [*Ireland v Edwards*, 230 Mich App 607, 622; 584 NW2d 632 (1998),

---

[5] By defamation, we mean a "communication . . . [that] tends to lower an individual's reputation in the community or deters third persons from associating or dealing with that individual." *Ireland v Edwards*, 230 Mich App 607, 614; 584 NW2d 632 (1998).

quoting *Grebner v Runyon*, 132 Mich App 327, 333; 347 NW2d 741 (1984).]

This high standard of proof is intended to avoid violating the free expression protections the First Amendment affords. See *Garvelink, supra* at 609.

Despite Faxon's claims to the contrary, the evidence of actual malice admitted at trial fell below this clear and convincing level. The record in this case is simply devoid of evidence that the committee had knowledge that any of the statements contained in the brochure were false at the time of publication. See *Herbert, supra* at 160; *Kevorkian, supra* at 9. David Doyle, the committee's executive director at the time it published the brochure, denied knowing any information in the brochure was false. Having relied on a variety of news articles reporting the matter, Doyle said that he had no reason to doubt the truth of the allegations. Similarly, Fred Wszolek, who worked at the consulting firm that published the brochure, conceded that information in the brochure was false,[6] but stated that he did not know it was false at the time of publication.

Nor was there any clear and convincing evidence that the committee published the brochure with reckless disregard of whether the statements were false. *Harte-Hanks, supra* at 659, quoting *New York Times Co v Sullivan*, 376 US 254, 279-280; 84 S Ct 710; 11 L Ed 2d 686 (1964). In other words, the evidence presented did not establish that the committee pub-

---

[6] Some of the information in the brochure varied from the information in the articles. However, Wszolek indicated that that was a simple error; he did not know that the information he included in the brochure was false for any reason.

lished the brochure with a " 'high degree of aware-
ness of . . . probable falsity' " or that the committee
" 'entertained serious doubts as to the truth of [the]
publication.' " *Harte-Hanks, supra* at 667, quoting
*Garrison v Louisiana,* 379 US 64, 74; 85 S Ct 209; 13
L Ed 2d 125 (1964), and *St Amant v Thompson,* 390
US 727, 731; 88 S Ct 1323; 20 L Ed 2d 262 (1968).
Rather, both Doyle and Wszolek explained that they
had relied on a series of other published news articles
that related the information included in the brochure.
Their failure to investigate the allegations in those
articles before including them in the brochure does
not constitute the reckless disregard that underlies
actual malice. *Harte-Hanks, supra* at 692; *Grebner,
supra* at 333. Although we recognize that "purposeful
avoidance of the truth" can constitute actual malice,
*Harte-Hanks, supra* at 692, there was no clear and
convincing evidence in this case that the committee
was attempting to avoid the truth when it decided not
to investigate this issue. Instead, the evidence tended
to substantiate the committee's claim that it was actu-
ally relying on those articles as the foundation for the
brochure and had no reason, at the time, to doubt
their veracity.

Faxon, however, claims that the *New York Times*
actual malice standard should not apply in this case
at all because the committee is not a member of the
media. The United States Supreme Court has not yet
settled this question. See *Harris v Quadracci,* 48 F3d
247, 253 (CA 7, 1995). Nevertheless, in making this
argument, Faxon ignores the fact that, at least in
Michigan, whether the actual malice standard is perti-
nent in a given case depends on whether a plaintiff is
a public official or public figure. The question

whether the defendant is part of the media is irrelevant to this determination. As MCL 600.2911(6); MSA 27A.2911(6) states:

> An action for libel or slander shall not be brought based upon a communication *involving public officials or public figures* unless the claim is sustained by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false. [Emphasis added.]

Subsection 6 does not further specify that the actual malice standard applies only to public figure or public officials suing members of the media. Subsection 6 is also in clear contrast to the next subsection, MCL 600.2911(7); MSA 27A.2911(7), which applies a lower negligence standard to the statement in cases involving a "private individual."

This actual malice standard has also been applied to cases involving public figures or public officials and nonmedia defendants. For instance, in *Ireland, supra* at 610-612, the plaintiff was a limited-purpose public figure who sued a nonmedia defendant, her former spouse's attorney, for making statements during a custody battle concerning the plaintiff's alleged unfitness to be a parent. On appeal, this Court stated that "because the parties here agree that plaintiff is a limited-purpose public figure, she must establish that defendant made the statements with actual malice." *Id.* at 615. In this case, there is no question regarding Faxon's status as a public figure.[7] Thus, having

---

[7] As becomes more clear from the next section of this opinion, the *New York Times* case also involved nonmedia defendants subjected to the actual malice standard. Therefore, we see no bar to applying that standard in this case.

applied the *New York Times* standard to the facts of this case, we conclude that the circuit court decision must be reversed, and the district court judgment in favor of Faxon must be vacated.[8]

### IV. *NEW YORK TIMES CO V SULLIVAN* AND ITS LEGACY

#### A. THE ABSENCE OF A REMEDY, PART I

The absence of sufficient evidence of actual malice in this case requires relief for the committee from the judgment and award. We would be remiss, however, if we did not mention how troubling we find the brochure and the absence of a legal remedy for this type of campaign defamation. We trace the lack of the remedy to the United States Supreme Court's decision in *New York Times Co v Sullivan, supra,* a case that laid the foundation for the modern jurisprudence relating to defamation in this country as a whole, including Michigan. Therefore, we examine *New York Times* to explain why Faxon has no redress available to him through the courts.

#### B. DEFAMATION LAW BEFORE *NEW YORK TIMES*

Before the Supreme Court decided *New York Times,* "the law of defamation and right of the ordinary citizen to recover for false publication injurious to his reputation have been almost exclusively the business of state courts and legislatures." *Gertz v Robert Welch, Inc,* 418 US 323, 369-370; 94 S Ct 2997;

---

[8] Although the committee did not object to the jury instructions the trial court issued, we also note that the jury was never instructed regarding what constituted "reckless disregard." This calls into question whether the jury properly deliberated on the factual questions set before it with the correct understanding of actual malice.

41 L Ed 2d 789 (1974) (White, J., dissenting); see also, generally, *Prudential Ins Co of America v Cheek*, 259 US 530, 543; 42 S Ct 516; 66 L Ed 1044 (1922) ("[N]either the 14th Amendment nor any other provision of the Constitution of the United States imposes upon the states any restrictions about 'freedom of speech' . . . ."). But see *Smith v California*, 361 US 147, 157-160; 80 S Ct 215; 4 L Ed 2d 205 (1959) (Black, J., concurring). As in contemporary times, truth was a defense to a defamation claim. See *Cox Broadcasting Corp v Cohn*, 420 US 469, 489, n 18; 95 S Ct 1029; 43 L Ed 2d 328 (1975). However, a defamed individual typically only had to prove that the statement in question subjected that individual to "hatred, contempt, or ridicule." See *Gertz, supra* at 370 (White, J., dissenting). Importantly, there was no consistently applied requirement that the defamed individual show that the publication or utterance was made with "actual malice." *New York Times* changed all of that.

## C. *NEW YORK TIMES* BACKGROUND

The *New York Times* case grew out of an "editorial advertisement" published in the newspaper on March 29, 1960. *New York Times, supra* at 256. The advertisement, entitled "Heed Their Rising Voices," attempted to raise money to support the civil rights struggle, including money to support student efforts, money to defend Dr. Martin Luther King, Jr., in the criminal perjury prosecution against him, and money to assist " 'the struggle for the right-to-vote.' " *Id.* at 257. The advertisement made a number of allegations concerning the violent efforts to suppress the civil rights movement, in effect stressing the dire need for

aid. Two of the allegations formed the basis for the suit. One of these two allegations read:

> "In Montgomery, Alabama, after students sang 'My Country, 'Tis of Thee' on the State Capitol Steps, their leaders were expelled from school, and truckloads of police armed with shotguns and tear-gas ringed the Alabama State College Campus. When the entire student body protested to state authorities by refusing to re-register, their dining hall was padlocked in an attempt to starve them into submission." [*Id.*]

The advertisement also asserted:

> "Again and again the Southern violators have answered Dr. King's peaceful protests with intimidation and violence. They have bombed his home almost killing his wife and child. They have assaulted his person. They have arrested him seven times—for 'speeding,' 'loitering' and similar 'offenses.' And now they have charged him with 'perjury'—a felony under which they could imprison him for ten years." [*Id.* at 257-258.]

These allegations, along with additional text, were printed above the names of sixty-four people, purportedly individuals who supported the advertisement. *Id.* at 257. The advertisement was signed at the bottom of the page by the " 'Committee to Defend Martin Luther King and the Struggle for Freedom in the South,' " with the officers of the committee listed. *Id.*

Following publication of the advertisement, L. B. Sullivan, an elected city commissioner in Montgomery, Alabama, sued four individuals[9] and the New York Times Corporation, which publishes the New

---

[9] The four individuals were apparently people whose names appeared in the advertisement.

York Times newspaper, for libel.[10] *Id.* at 256. The Alabama libel law at issue made a publication " ' "libelous per se" if the words "tend to injure a person . . . in his reputation" or to "bring (him) into public contempt" . . . .' " *Id.* at 267 (citations omitted). Unless the defendant accused of libel could prove that the statements were in fact true, then damages were presumed. *Id.* "Good motives and belief in truth" did not absolve the defendant of liability. *Id.* Rather, those states of mind, which are relevant to malice in other types of actions, merely mitigated punitive damages in a libel action. *Id.*

At trial, Sullivan claimed and was able to prove that some of the statements in the advertisement were in fact false. For instance, the students sang "the National Anthem, and not 'My Country, 'Tis of Thee.' " *Id.* at 258-259. Fewer than the entire student body had protested the state board of education's decision to expel nine students by boycotting class on one day, not by refusing to register. *Id.* at 259. Further, the police did not "ring" the campus, no one padlocked the campus dining hall, and Dr. King had been arrested four times, not seven times. *Id.* Sullivan, supported by a number of other Montgomery residents who testified on his behalf, also alleged that even though he was not named in the advertisement, the false statements were aimed at him because his duties as an elected official included supervising the Montgomery Police Department. *Id.* at 258. Sullivan asserted that the more ambiguous references to

---

[10] For additional background on the circumstances leading to the *New York Times* case, see Note, *Malice, lies, and videotape: Revisiting* New York Times v Sullivan *in the modern age of political campaigns*, 30 Rutgers L J 755, 762-765 (1999).

"they" in the advertisement surely referred to him even though he had nothing to do with the actions the advertisement described. *Id.* at 258-259.

The defense to the libel actions was, it appears, rather simple. According to a manager at the New York Times who approved the advertisement, he had no reason to believe that the information in the advertisement was false. *Id.* at 261. Because many prominent individuals had signed the advertisement, he saw no reason to question or investigate the veracity of the assertions. *Id.*

The Alabama trial court instructed the jury that the statements were libelous per se, the " 'law . . . implies legal injury from the bare fact of publication itself,' " " 'falsity and malice are presumed,' " damages need not be proved, and punitive damages could be awarded even without determining the existence of actual damages. *Id.* at 262 (citation omitted). Among other things, the trial court refused to charge the jury that it had to find actual malice in order to award damages and refused to accept that its ruling violated the freedom of speech. *Id.* 262-263. Substantively, the only factual issue truly free for the jury to decide was whether the statements in the advertisement referred to Sullivan. *Id.* at 262. The jury ultimately awarded Sullivan $500,000. *Id.* at 256. When the New York Times and others appealed, the Alabama Supreme Court affirmed the trial court's rulings and instructions in all respects. *Id.* at 263.

### D. THE *NEW YORK TIMES* DECISION

The United States Supreme Court reversed the decision of the Alabama Supreme Court, holding

that the rule of law applied by the Alabama courts is consti-
tutionally deficient for failure to provide the safeguards of
freedom of speech and of the press that are required by the
First and Fourteenth Amendments in a libel action brought
by a public official against critics of his official conduct.
[*Id.* at 264.]

Additionally, the Court held that even "under the proper safeguards," there was insufficient evidence to sustain the jury's verdict. *Id.*

As the heart of its opinion, the Supreme Court first noted that the manner in which speech was described had no effect on whether it was protected under the First Amendment. *Id.* at 269. Thus, objectionable speech could not be placed in its own category for the purpose of analysis. *Id.* The Court emphasized the public and civic value of free speech and used that concept to frame the issue on appeal "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270.

As an historical foundation for the Court's views of the evils of censored or otherwise limited speech, the opinion discussed with some depth the Sedition Act of 1798, 1 Stat 596, which generally forbade defama-tory speech aimed at the Congress, the President, or the United States government. *Id.* at 273-276. The opinion also explained that the threat of financial lia-bility was every bit as inhibiting to free speech as the threat of criminal prosecution. *Id.* at 277-278. Relying on Fourteenth Amendment precedent, the Court flatly rejected the contention that First Amendment protec-

tions limited only the federal government, not the states. *Id.* at 276-277. Setting the stage for its central conclusion that civil liability for libel chills free speech, the Court examined the number of protections available in criminal libel prosecutions and contrasted them with the virtual absence of protections in civil libel cases. *Id.* at 277-278. The Court then observed that constitutional protection for speech could not depend on whether statements were true, because a truthtest would lead to " 'self-censorship.' " *Id.* at 278-279.

Finally, finding support for the actual malice standard in state law, the Court articulated the oft_cited formulation of the new standard for defamation. *Id.* at 280-281. This rule "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with the knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279-280. Thus, from the perspective of the majority, while monetary damages were a remote possibility for defamation aimed at public officials acting in their official roles, damages did remain a possible remedy for the injuries that defamation inflicted. The Court noted that this rule was equitable because it essentially protected the speech of public officials and their critics to a similar extent. *Id.* at 281-283.

While six justices signed the majority opinion, which Justice Brennan authored, the three concurring justices did not advocate *greater* access to the courts for public officials who had been defamed in their public roles. To the contrary, Justices Black, Douglas, and Goldberg supported an even higher "absolute"

and "unconditional" standard protecting speech aimed at official conduct by a public officer. *Id.* at 293, 298. As with the majority opinion, the concurrences went to considerable effort to put the right to free speech in an historical context, with a special emphasis on the insidious nature of the Sedition Act of 1798. *Id.* at 296, 298, n 1. Justice Black's concurrence, which Justice Douglas joined, also referred several times to the amount of the jury's verdict in the *New York Times* case, emphasizing the devastating effect that similar pending actions could have on free speech should they be equally successful.[11] *Id.* at 293-295. While Justice Goldberg's concurrence, with which Justice Douglas joined in the result, spent less time discussing the issue of money, it nonetheless directly rebutted the proposition that free speech and the threat of money damages could coexist. *Id.* at 300. Instead, Justice Goldberg believed that education, counter-argument, and access to the media were all that were necessary—meaning permissible under the First Amendment—to provide a remedy for injurious falsehoods. *Id.* at 305, quoting *Wood v Georgia*, 370 US 375, 389; 82 S Ct 1364; 8 L Ed 2d 569 (1962). In other words, from Justice Goldberg's perspective, not only were the remedies for this form of defamation widely available through informal means, they were generally not available through the courts.

In all, the nine members of the Court recognized an undiluted First Amendment right to criticize government as conducted by its elected officials. The three

---

[11] Justice Black, of course, denied that the amount of the verdict in favor of Sullivan influenced his decision to reverse. *Id.* at 293. Nevertheless, his repeated references to the size of the verdict reveals the extent to which he believed that money damages could chill speech.

concurring justices,· in an effort to support their unyielding opposition to money damages as a remedy for this form of defamation, articulated reasoning that was remarkably similar to the majority's reasoning. As a result, it should come as no surprise that modern commentators have described the *New York Times* decision as an attempt to create a comprehensive constitutional regime that avoids three central but corrupting influences: the temptation to resurrect laws against seditious libel, which can be viewed as "the 'original sin' of First Amendment jurisprudence," the coercive power of money, and the "chilling effect" on speech that exists if critics of official conduct must guarantee the truth of their factual assertions.[12]

### E. REMEDIES AFTER *NEW YORK TIMES*

Despite the somewhat limited goal of avoiding these three dangers underlying the constitutional framework announced in *New York Times*, the United

---

[12] See *Malice, Lies, and Videotape, supra* at 765; see also *Curtis Publishing Co v Butts*, 388 US 130, 145, 153; 87 S Ct 1975; 18 L Ed 2d 1094 (1967) (Harlan, J.) (noting the emphasis on the analogy to seditious libel in *New York Times*). Whether those three concerns articulated in *New York Times* are present in this case is up for debate. At the time the committee published the brochure, Faxon was not merely a private citizen running for office. He was a public official seeking reelection and the committee's brochure challenged, in part, his decision to use his constitutional authority to assert immunity from suit while the Legislature was in session. Thus, excluding the references to Faxon's art transaction, this suit may resemble, to a limited degree, the sort of criticism of government officials prohibited by seditious libel laws. As for the chilling effect that money damages might have if the jury's verdict were allowed to stand following this appeal, we doubt that the committee would be forced to close its doors and shutter its windows if it were forced to pay Faxon $150,000 to restore his good name. Whether this single law suit would prevent other individuals and organizations interested and involved in politics from commenting concerning questions of public concern is, we observe, not so clear.

States Supreme Court almost immediately began expanding the scope of this constitutional free speech doctrine beyond its original political speech focus.[13]

---

[13] The Court took its first big step forward after *New York Times* when, in 1964 in *Garrison, supra* at 67-68, 74-75, it extended the actual malice standard to criminal libel laws. The plurality decision in *Curtis Publishing Co v Butts,* 388 US 130, 155; 87 S Ct 1975; 18 L Ed 2d 1094 (1967), applied a standard very similar to actual malice to "public figures," moving away from applying the standard only to public officials, i.e., those who serve in government. From Justice Harlan's perspective:

> We consider and would hold that a 'public figure' who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. [*Id.* at 155.]

While Chief Justice Warren, who concurred in the result announced in Justice Harlan's opinion, preferred a rule that did not distinguish between public figures and public officials. *Id.* at 163.

The Supreme Court returned to examine the nature of the actual malice standard itself in *St Amant, supra* at 731, where the Court held that actual malice was a subjective concept: "[R]eckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." The Court in *Gertz, supra* at 347, held that states could permit individuals who were neither public figures nor public officials to recover for defamation as long as the states did not permit "liability without fault." In other words, *Gertz* required private individuals to prove more than a false statement, they had to prove some negligence behind the statement to recover for damage to reputation, and then only for actual damages that could not merely be presumed. *Id.* at 348-350; *Rouch, supra* at 252. Later, the Court raised procedural bars to recovery of money damages by making it more difficult to prove actual malice even before a case was submitted to a jury. See *Anderson v Liberty Lobby, Inc,* 477 US 242, 252, 254-255; 106 S Ct 2505; 91 L Ed 2d 202 (1986) ("When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure [for the purposes of summary judgment under the Federal Rules of Civil Procedure], a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times*."). But see *Steadman v Lapensohn,* 408 Mich 50, 53-55; 288 NW2d 580 (1980), questioned by *Ireland, supra* at 622-623, n 13 (applying the ordinary standard for summary disposition under state civil procedure rules). This followed on the heels

As Justice White later saw it, this trend was a "seemingly irreversible process of constitutionalizing the entire law of libel and slander." *Dun & Bradstreet, Inc v Greenmoss Builders, Inc*, 472 US 749, 766; 105 S Ct 2939; 86 L Ed 2d 593 (1985) (White, J., concurring). In the process, however, the progress made toward protecting the free-flowing public discussions the *New York Times* decision envisioned outpaced the efficacy of the available remedies.

Nowhere is this growing divide between defamatory falsehood and remedy clearer than in the world of campaigns for elective office, where time is of the essence and negative campaign advertisements are prevalent.[14] The essence of the problem is that even if an individual makes a defamatory statement with actual malice in the period preceding an election, the damage often cannot be undone, regardless of the opportunity for redress. A brazen candidate, or that candidate's supporters, may be willing to risk the threat of a law suit sometime in the future in return

---

of the decision in *Bose Corp v Consumers Union of United States, Inc*, 466 US 485, 510; 104 S Ct 1949; 80 L Ed 2d 502 (1984), which made it more difficult for a plaintiff to retain a favorable jury verdict and award in the appellate review process by prescribing an independent review of the evidence supporting actual malice on appeal to determine whether it was sufficient.

[14] The extent to which negative advertising has grown is debatable. See Associated Press, *Positive Outweighs Negative In Ads*, Milwaukee Journal Sentinel Online (Sept 19, 2000) <http://www.jsonline.com/election99/ap/sep00/ap-positive-ads091900.asp>; Karl Leif Bates, *Muddying the message: Why negative political ads work*, Detroit News (June 17, 1996) <http://detnews.com/menu/stories/52406.htm>. Further, we are unaware of any statistics that report the proportion of such advertisements that might constitute actionable defamation. Nevertheless, we think it fair to conclude that the majority of individuals who have observed recent elections would agree that the current climate in campaigning lends itself to the sort of negative statements that, if proved untrue, would certainly be considered defamation.

for victory in an election. In other words, money or exposure is a small price to pay when the goal is to win by any means necessary. Increasingly, winning at all costs has become a hallmark of modern American politics.

As a matter of theory, Justice Goldberg's suggestion in *New York Times* that education, counterargument, and access to the media might combat the injuries inflicted by defamation has a reasonable ring to it. A citizen like L. B. Sullivan might have been able to restore his allegedly damaged reputation by contacting the local newspapers, granting interviews to radio and television reporters, speaking to friends and neighbors, or even printing his own rebuttal advertisement to point out the faulty factual assertions in the advertisement. Given his high profile within his community, as well as the fame of other people mentioned in the article, we have little doubt that Sullivan would have found a way to publicize his cause. By using this public exposure to present his arguments in the press, we similarly have little doubt that he would have been able to reclaim his good name at some point.

Nevertheless, time and prestige (or notoriety) act as practical limits on these extrajudicial means of combating defamation. Sullivan may have had all the time in the world to clear his name, but election day looms large for anyone seeking public office. See, generally, Comment, *The politics of ethics and elections: Can negative campaign advertising be regulated in Florida?*, 24 Fla St U L R 463, 469 (1997). The calculating defamer knows that a carefully timed false allegation will not only draw attention, it will remain in voters' minds as they enter the polls, all

without allowing an adequate response by the target. The case here is a good example of time as a limiting factor. Although the conduct the committee sought to publicize occurred before 1990, the committee waited to publish the pamphlet until about a week before the election. This gave Faxon virtually no time to respond to the allegations in a meaningful way.[15] While he may have contacted the media to convey his side of the story, he certainly had little opportunity to discover and communicate with all 30,000 people who received the brochure about its deceptive and untrue nature.

As for prestige or notoriety, they can be either a blessing or a curse. But such prestige or notoriety almost always affects the way a defamatory statement is spread and how or whether its effect can be abated. These factors certainly play a role in the way a person wishing to accuse another of some disreputable conduct or quality can attract attention in the first place. Someone like Faxon, a long-time member of state government, was likely to attract attention from the local press whether he was working on new legislation or being accused of selling fake antiquities. Yet, precisely because he was a public figure,[16] an allegation that might otherwise be perceived as patently false from its first utterance would also be likely to haunt him in the media for a protracted period. In other words, *he* was the news and the facts underlying the allegations were only incidental to the media's interest in the story. Thus, someone like

---

[15] Nor was the committee adopting a unique technique in taking advantage of this type of close timing. See *Harte-Hanks, supra* at 660 (newspaper article allegedly defaming incumbent in judicial election published one week before election; incumbent lost).

[16] Of course, the irony is that this public stature is also what subjected him to the actual malice standard.

Faxon would be likely to obtain the media's attention in order to rebut a false allegation, but he probably would have had to expend substantially more effort clearing his good name than someone who was less well-known.

People with less prestige or notoriety also suffer, but in different ways from the well-known. The media may conclude that a defamatory statement is not newsworthy and, by their voluntary forbearance, a false statement may never be made known widely. In contrast, however, once defamed, a less-well-known individual may have a difficult time persuading the media to publish the truth. One need only look at the controversy surrounding the decision to exclude third-party or independent candidates from national debates in presidential elections to see how, even among those who might be considered famous public figures, the relative degree of prestige or notoriety affects the limited remedy that even Justice Goldberg would recognize in access to the media. See *Arkansas Educational Television Comm v Forbes*, 523 US 666; 118 S Ct 1633; 140 L Ed 2d 875 (1998). If that were not enough, newspaper readers will be familiar with the visual difference between an attention-grabbing allegation in a front-page headline and, unfortunately, the often small and obscured retraction in the rare cases when a retraction is offered.[17]

---

[17] Although amendments of Michigan's libel laws have attempted to combat this tendency to publicize the defamation and hide the retraction, its provisions are not absolute. See MCL 600.2911(2)(b); MSA 27A.2911(2)(b) ("For libel based on a radio or television broadcast, the retraction shall be made in the same manner and at the same time of the day as the original libel; for libel based on a publication, the retraction shall be published in the same size type, in the same editions and *as far as practicable*, in *substantially* the same position as the original libel; and

Moreover, even though we may view access to the media as an expedient way to present counterargument, it may not be the best way to educate. Education may require special preparation and materials, not to mention an effort to open individuals' minds to the lesson being taught and to recruit individuals to help. These components each require time and personal interaction. When a defamer takes advantage of an impending deadline, education, often viewed as an effective but slow avenue for lasting change, may simply not be an option. Of equal concern is the fact that, once defamed, the target may find it very difficult, if not impossible, to locate people to help with the educational effort precisely because the defamatory statement has had its intended effect. Even if the target has a cadre of loyal supporters unaffected by the defamatory statement, the nature of the defamation may make education impossible because those exposed to the falsehood may have been persuaded to discredit the target entirely.[18]

What, then, are alternative remedies? In the elections context, the suggestions are far ranging. In a 1988 policy paper, Stephen Bates outlined a variety of proposals that would have limited the form and content of advertisements candidates for political office would have been able to use during a campaign in an effort to constrain the opportunity for negative campaigning. See Bates, *Political advertising regulation: An unconstitutional menace?*, Cato Institute,

---

for other libel, the retraction shall be published or communicated in *substantially* the same manner as the original libel.") (emphasis added).

[18] We note that, although the committee essentially accused Faxon of theft, dishonesty, and abuse of his authority as a legislator, Faxon was able to survive the allegations and win the election. Still, his victory was by unusually narrow margins in comparison to his earlier elections.

Policy Analysis No. 112 (Sept 22, 1988) <http://www.cato.org/pubs/pas/pa112.html>. These proposals ran the gamut from eliminating all paid television advertising or requiring the candidate to appear in television advertisements to regulating the length of advertisements and the type of specially produced material that may appear in a television advertisement. *Id.*; see also Moran, *Format restrictions on televised political advertising: Elevating political debate without suppressing free speech*, 67 Ind L J 663 (1992) (advocating air time subsidies conditioned on candidate consent to format restrictions). Of course, even Bates recognized the high likelihood that these reforms would encounter problems with the First Amendment. Minimally, in our opinion, they would inhibit the free flow of ideas promised by the First Amendment. Even if these proposals were constitutional, we see little likelihood that even their intrusive and controlling natures would reduce the opportunity to engage in campaign defamation.

One particularly interesting proposal would permit equitable actions for "campaign slander." Note, *Malice, lies, and videotape: Revisiting New York Times v Sullivan in the modern age of political campaigns*, 30 Rutgers L J 755, 791-792 (1999).[19] While no damages would be available, the trial court sitting in equity would be allowed to fashion other remedies for the defamed plaintiff. *Id.* at 792. Essentially, this approach would use the public record created in the judicial proceeding to correct the falsehood, provide moral vindication, and preclude litigating the issue in

---

[19] This thoughtful student work is based largely on writings by Justice White and Ronald Dworkin. *Malice, lies and videotape, supra* at 786-791.

other actions. *Id.* Having removed money damages from the equation of this remedy, this proposal certainly avoids chilling free speech. Ignoring practical limits that the cost of such a court action would likely impose, this proposal also provides a remedy open to everyone, not just the well-known. Yet, as this proposal's own author concedes, it is unlikely that the courts could resolve a controversy within the time frame imposed by an election.[20] *Id.* at 795-796.

Other suggestions appear to prevent defamation indirectly by limiting or eliminating negative campaigning, as well as offering a variety of remedies. These suggestions include increased monitoring of advertisements and statements, prohibiting anonymous advertising, having candidates adhere to voluntary codes of conduct, requiring candidates to endorse advertisements, governmental, citizen, or media organizations that investigate and fine individuals engaged in false political advertising, restricting the actual malice standard to media defendants, and preventing attack advertising near an election. See Note, *Deception in political advertising: The clash between the First Amendment and defamation law*, 16 Cardozo Arts & Ent L J 667, 681-685, 690, 695-696 (1998); The *politics of ethics and elections, supra* at 474-497.

---

[20] The 2000 presidential election and the controversy surrounding certifying the popular vote in Florida in time to comply with deadlines associated with the Electoral College exemplifies the lengths to which the courts will go to accommodate a tight schedule. Yet, that example also demonstrates that, no matter how quickly courts work, they cannot always meet time demands.

F. THE ABSENCE OF A REMEDY, PART II

There is no question that the absence of a judicial remedy for defamation for public officials or public figures absent proof of actual malice is purposeful. The Supreme Court in *New York Times* did not accidentally leave a void in the law that denies redress for individuals who, had they been merely private citizens, would have been able to seek money damages to compensate them for damage to their reputation from defamation. Rather, the majority opinion gave weight to the view that the value of free speech is so great and the risk of defamatory speech so small that the balance between those two interests clearly tips in favor of free speech. *New York Times, supra* at 281-282, quoting *Coleman v MacLennan*, 78 Kan 711, 723-724; 98 P 281 (1908). Justice Black summed up this sentiment in his concurrence when he wrote:

> This Nation, I suspect, can live in peace without libel suits based on public discussions of public affairs and public officials. But I doubt that a country can live in freedom where its people can be made to suffer physically or financially for criticizing their government, its actions, or its officials. [*New York Times, supra* at 297.]

As Justice Goldberg put it:

> [D]espite the possibility that some excesses and abuses may go unremedied, we must recognize that "the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, [certain] liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." [*Id.* at 305, quoting *Cantwell v Connecticut*, 310 US 296, 310; 60 S Ct 900; 84 L Ed 1213 (1940).]

While this balance between free speech and good reputation represents binding precedent, and thus the approach we must take in this case, the steady expansion of the sweep of the rule in *New York Times* has not been without its critics. Among them was Justice Byron White. In his concurring opinion in *Dun & Bradstreet, supra* at 767, Justice White gave what we consider to be a comprehensive discussion of the expense exacted by this balance between interests, one that he called an "improvident balance." Justice White went on to observe:

First Amendment values are not at all served by circulating false statements of fact about public officials. On the contrary, erroneous information frustrates these values [underlying the right to speak freely]. They are even more disserved when the statements falsely impugn the honesty of those men and women and hence lessen the confidence in government. . . . Yet in *New York Times* cases, the public official's complaint will be dismissed unless he alleges and makes out a jury case of a knowing or reckless falsehood. Absent such proof, there will be no jury verdict or judgment of any kind in his favor, even if the challenged publication is admittedly false. The lie will stand, and the public continue to be misinformed about public matters. This will recurringly happen because the putative plaintiff's burden is so exceedingly difficult to satisfy and can be discharged only by expensive litigation. Even if the plaintiff sues, he frequently loses on summary judgment or never gets to the jury because of insufficient proof of malice. If he wins before the jury, verdicts are often overturned by appellate courts for failure to prove malice. Furthermore, when the plaintiff loses, the jury will likely return a general verdict and there will be no judgment that the publication was false, even though it was without foundation in reality. The public is left to conclude that the challenged statement was true after all. Their only chance of being accurately informed is measured by the public official's ability himself to counter the lie, unaided by the courts. That is a decid-

edly weak reed to depend on for the vindication of First Amendment interests—"it is the rare case where the denial overtakes the original charge. Denials, retractions, and corrections are not 'hot' news, and rarely receive the prominence of the original story."

Also, by leaving the lie uncorrected, the *New York Times* rule plainly leaves the public official without a remedy for the damage to his reputation. Yet the Court has observed that the individual's right to the protection of his own good name is a basic consideration of our constitutional system, reflecting " 'our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.' " The upshot is that the public official must suffer the injury, often cannot get a judgment identifying the lie for what it is, and has very little, if any, chance of countering that lie in the public press.

The *New York Times* rule thus countenances two evils: first, the stream of information about public officials and public affairs is polluted and often remains polluted by false information; and second, the reputation and professional life of the defeated plaintiff may be destroyed by falsehoods that might have been avoided with a reasonable effort to investigate the facts. In terms of the First Amendment and reputational interests at stake, these seem grossly perverse results.

Of course, the Court in *New York Times* could not have been unaware of these realities. Despite our ringing endorsement of "wide-open" and "uninhibited" debate, which taken literally would protect falsehoods of all kinds, we cannot fairly be accused of giving constitutional protection to false information as such, for we went on to find competing and overriding constitutional justification for our decision. The constitutional interest in the flow of information about public affairs was thought to be very strong, and discovering the truth in this area very difficult, even with the best of efforts. These considerations weighed so heavily that those who write and speak about public affairs were thought to require some breathing room—that is, they should be permitted to err and misinform the public as long as they act unknowingly and without recklessness. If the

> press could be faced with possibly sizable damages for every mistaken publication injurious to reputation, the result would be an unacceptable degree of self-censorship, which might prevent the occasional mistaken libel, but would also often prevent the timely flow of information that is thought to be true but cannot be readily verified. The press must therefore be privileged to spread false information, even though that information has negative First Amendment value and is severely damaging to reputation, in order to encourage the full flow of the truth, which otherwise might be withheld. [*Id.* at 767-770 (citations omitted).]

Justice White's words have remarkable relevance to this case. Despite the committee's protests to the contrary, some of the statements contained in the brochure were at least arguably false. At a minimum, we believe it fair to say that the committee's brochure contained factual errors. More broadly, we agree with Faxon that the "gist" of the brochure was that he, an art expert, sold fake art to an unsuspecting buyer. A reader of the brochure might well conclude that Faxon stood branded as a crook and that brand apparently remains today. Further, because we must follow the *New York Times* precedent as it has been incorporated in the decisions of the Michigan Supreme Court and this Court, we leave Faxon, now a former public official, without a remedy for the damage to his reputation The twin evils to which Justice White spoke are thus present with a vengeance: the stream of public information about Faxon was and remains polluted by false information and his reputation and professional life have been damaged.

This is not a result of which, to say the least, we are enamored. We recognize the value of open, free-wheeling, and "robust" political debate. Like Justice

White, however, we question the value of arguably false, defamatory, and negative political advertising whose purpose is not to defeat an opponent but to demean and destroy that opponent. Nonetheless, an intermediate state appellate court lacks the authority to change the well-defined constitutional scheme we apply in this case. Under *New York Times* and its progeny, including the Michigan cases we have cited above, Faxon has failed to demonstrate actual malice by clear and convincing evidence. We must therefore vacate the judgment below, but we do so with reluctance. In light of our conclusion regarding the "actual malice" issue, we need not address the committee's other arguments.

Circuit court orders reversed and district court judgment vacated.