SEYMOUR, Circuit Judge.
Thomas Mink appeals the district court’s dismissal of his 42 U.S.C. § 1983 complaint against Susan Knox, a deputy district attorney, on qualified immunity grounds. We reverse.
I.
Mr. Mink, a student at the University of Northern Colorado (“UNC”), created a fictional character, “Junius Puke,” for the editorial column of his internet-based journal, The Howling Pig.[1] Mink v. Suthers, 482 F.3d 1244, 1249 (10th Cir.2007), cert. denied, 552 U.S. 1165, 128 S.Ct. 1122, 169 L.Ed.2d 949 (2008) (“Mink I”). The editorial column displayed altered photographs of Junius Peake, a UNC professor, wearing dark sunglasses and a Hitler-like mustache. Id. at 1249. Junius Puke’s editorial column addressed subjects on which Mr. Peake would be unlikely to write, in language he would be unlikely to use, asserting views that were diametrically opposed to Mr. Peake’s. See id.
Mr. Peake, who was not amused, contacted the Greeley police, who started investigating a potential violation of Colorado’s criminal libel statute, Colo.Rev.Stat. § 18-13-105. See Mink v. Knox, 566 F.Supp.2d 1217, 1220 (D.Colo.2008) (“Mink II”). In conformance with Colorado Re *999 vised Statute § 20-1-106.1, the detective in charge prepared a search warrant affidavit to submit to the office of the district attorney for legal review. The deputy district attorney, Susan Knox, reviewed and approved the search warrant affidavit, which was identical to the warrant with respect to the eleven paragraphs listing the items to be seized. The search warrant and affidavit were both attached to Mr. Mink’s amended complaint, and are attached to this opinion as Exhibits A and B.[2] The affidavit and warrant were presented to and approved by a magistrate judge. The Greeley police then searched the home where Mr. Mink lived with his mother and confiscated their personal computer, as well as written materials referencing The Howling Pig. See Mink I, 482 F.3d at 1249.
Mr. Mink and his mother subsequently filed suit in federal district court against the City of Greeley, Colorado, the district attorney, Detective Ken Warren, and a “John Doe” assistant district attorney, seeking damages for the search and seizure, among other things. The district court granted Mr. Mink’s motion for a temporary restraining order and ordered the City of Greeley to return “to the Plaintiffs the computer, and all contents thereof, seized following the search of Plaintiffs’ home.” Id. at 1250 (quoting Dist. Ct. Order, Jan. 9, 2004, at 1). Thereafter, the district attorney issued a written “No File” decision, concluding that the statements contained in The Howling Pig could not be prosecuted under the Colorado criminal libel statute.
Mr. Mink then amended his complaint, removing his mother as a plaintiff and adding Ms. Knox as a defendant.[3] The district court granted Ms. Knox’s motion to dismiss the suit in its entirety, holding in part that Mr. Mink’s constitutional claims against Ms. Knox were barred by absolute immunity. We reversed, determining that
a prosecutor is entitled to absolute immunity for those actions that cast him in the role of an advocate initiating and presenting the government’s case. Absolute immunity, however, does not extend to those actions that are investigative or administrative in nature, including the provision of legal advice outside the setting of a prosecution.
Id. at 1261-62. We concluded that Ms. Knox “was not wearing the hat of an advocate,” id. at 1262, when she reviewed the affidavit in support of the warrant, and “thus, is not entitled to absolute prosecutorial immunity.” Id. at 1263. Nevertheless, we noted that Ms. Knox “may be entitled to qualified immunity if she reasonably concluded probable cause existed to support the warrant application, or that the application of the Supreme Court’s First Amendment cases to the criminal libel statute was not clearly established under the circumstances here.” Id.
On remand the district court granted Ms. Knox’s motion to dismiss the amended complaint, holding that (1) “a reasonable official in Knox’s position could believe that the statements in The Howling Pig were not protected statements under the First Amendment — and, accordingly, that Plaintiffs actions in publishing such statements could subject him to criminal prosecution under the Colorado libel statute,” and (2) although the search warrant violated the Fourth Amendment’s particularity *1000 requirement, it was not clearly established that Ms. Knox’s authorization of the search warrant affidavit lacking particularity violated the Fourth Amendment. Mink II, 566 F.Supp.2d 1217, 1223-24, 1228-29. The district court concluded that Ms. Knox was entitled to qualified immunity.
On appeal, Mr. Mink asks us to decide whether the district court erred when it dismissed,
on the basis of qualified immunity, Mr. Mink’s claim alleging an unlawful search and seizure in violation of the Fourth Amendment, where the search lacked probable cause because clearly-established First Amendment law protected Mr. Mink’s speech, and because the overbroad affidavit and warrant violated clearly-established Fourth Amendment law[.]
Aplt. Br. at 2.
II.
“[F]ederal courts engage in de novo review when mulling defamation issues that are tinged with constitutional implications.” Levinsky’s, Inc. v. WalMart Stores, Inc., 127 F.3d 122, 127 (1st Cir.1997). “This requirement of independent appellate review is not a procedural directive, but, rather, ‘a rule of federal constitutional law’ that ‘reflects a deeply held conviction that judges ... must exercise such review in order to preserve the precious liberties established and ordained by the Constitution.’ ” Id. (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 510-11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)).
To determine whether a motion to dismiss was properly granted, we apply a plausibility standard to ascertain whether the complaint includes enough facts that, if assumed to be true, state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, - U.S. -, -, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (“A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.”). See also Corder v. Lewis Palmer Sch. Dist. No. 38, 566 F.3d 1219, 1223-1224 (10th Cir.2009). We accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party, here the plaintiff. See Archuleta v. Wagner, 523 F.3d 1278, 1283 (10th Cir.2008); Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc., 521 F.3d 1278, 1284 (10th Cir.2008).
We also review de novo the district court’s decision regarding qualified immunity. Archuleta, 523 F.3d at 1282. “[Government officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Id. at 1282-83 (quoting Wilson v. Layne, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). “Once the qualified immunity defense is asserted, ... the plaintiff must demonstrate that the defendant’s actions violated a constitutional or statutory right” and that “the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue.”[4] Id. In determining whether a constitutional right was clearly established, we look at the specific context of the case. Bowling v. Rector, 584 F.3d 956, 964 (10th Cir.2009).
*1001 A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits. There need not be precise factual correspondence between earlier cases and the case at hand, because general statements of the law are not inherently incapable of giving fair and clear warning. The right must only be sufficiently clear that a reasonable official would understand that what he is doing violates that right.
Archuleta, 523 F.3d at 1283 (internal citations, quotation marks, and alterations omitted).
In dismissing Mr. Mink’s amended complaint, the district court considered whether: (1) there was a causal connection between Ms. Knox’s actions and the alleged violation of Mr. Mink’s constitutional rights; (2) Mr. Mink’s constitutional rights were violated; and (3) the violated constitutional rights were clearly established at the time the violation occurred. We address each of these questions in turn.
A.
The Causal Connection
Mr. Mink alleged that Ms. Knox caused the issuance of a search warrant that lacked probable cause and particularity, thereby causing a violation of his Fourth Amendment rights. The district court held that in order to recover on this claim, Mr. Mink was required to allege Ms. Knox’s direct participation in the constitutional violation, and that he had failed to do so:
Plaintiff does not, however, allege that Knox issued the warrant, nor that she reviewed the warrant, nor that she participated in the search and seizure executed pursuant to the warrant. The question here, therefore, is whether — • taken in the light most favorable to Plaintiff — the complaint alleges sufficient facts to show Knox — solely by reviewing and approving the affidavit submitted in support of the search warrant — violated Plaintiffs constitutional rights.
Mink II, 566 F.Supp.2d at 1229. In so construing the amended complaint, the district court erred.
Title 42 U.S.C. § 1983 provides, in relevant part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
Id. (emphasis added). “The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.” Snell v. Tunnell, 920 F.2d 673, 700 (10th Cir.1990). Thus, “[f]or liability under Section 1983, direct participation is not necessary.” Id. (quotation omitted); see also Buck v. City of Albuquerque, 549 F.3d 1269, 1279-80 (10th Cir.2008). “Any official who ‘causes’ a citizen to be deprived of her constitutional rights can also be held liable.” Snell, 920 F.2d at 700 (quotation omitted). The plaintiff may demonstrate causation by showing an affirmative link between the constitutional deprivation and the officer’s exercise of control or direction. See Poolaw v. Marcantel, 565 F.3d 721, 732 (10th Cir.2009) (presence during search held unnecessary for § 1983 *1002 liability for unconstitutional search where one defendant officer authorized search and second defendant officer drafted affidavit for search warrant);[5] Wulf v. City of Wichita, 883 F.2d 842, 864 (10th Cir.1989) (concluding defendant was sufficiently involved in entire decision-making process and thus personally liable where Personnel Advisory Board listened to defendant’s recommendation and, to some extent, relied on it).
On appeal, Ms. Knox urges us to affirm the district court’s sua sponte conclusion that the complaint should be dismissed because it did not specifically allege that Ms. Knox reviewed the warrant as well as the affidavit. We decline to do so. Notably, as Mr. Mink points out, both the affidavit and search warrant were attached to the amended complaint, and Ms. Knox’s own affidavit subsequently indicated that the warrant was one of the documents she reviewed, in accordance with Colo.Rev. Stat. § 20-1-106.1.[6] Being well aware that she had reviewed the warrant no doubt explains why Ms. Knox never moved to dismiss the complaint on this basis.
More importantly, taking Mr. Mink’s allegations as true, viewing them in the light most favorable to him, and making all reasonable inferences in his favor, as we are required to do, persuades us that the amended complaint plausibly asserted the requisite casual connection between Ms. Knox’s conduct and the search and seizure that occurred at Mr. Mink’s home. The amended complaint not only alleged that Ms. Knox “reviewed and approved the affidavit submitted to the state district court in support of the warrant to search the Mink’s home,” Aplt.App., vol. I at 117, 119, it also alleged that she “authorized and caused an unlawful seareh[,]” id. at 118, that “[a] reasonable prosecutor would have known that the warrard failed to meet the particularity requirement of the Fourth Amendment,]” id. at 119 (emphasis added), and that “[a] reasonable *1003 prosecutor would have known that the affidavit failed to establish probable cause to search and seize the items described in the warrant.” Id. (emphasis added). These allegations, coupled with the attachment of the warrant and affidavit to the complaint, support the reasonable factual inference that Ms. Knox reviewed the warrant as well as the affidavit, and that her approval set in motion a series of events that she knew or reasonably should have known would cause others to deprive Mr. Mink of his constitutional rights.
B.
Mr. Mink’s Allegations, If True, Establish a Constitutional Violation
Mr. Mink alleged that the search and seizure of his property based on an invalid warrant violated his Fourth Amendment rights. Three conditions must be met for searches and seizures pursuant to a warrant to be constitutional.
First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense. Finally, warrants must particularly describe the things to be seized, as well as the place to be searched.
Dalia v. United States, 441 U.S. 238, 255, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979) (internal citations and quotation marks omitted). These requirements ensure “that no intrusion in the way of search or seizure occurs without a careful prior determination of necessity, and preventing the specific evil of the general warrant abhorred by the colonists.” Bolding, 584 F.3d at 967; see also Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Cassady v. Goering, 567 F.3d 628, 634-35 (10th Cir.2009). Mr. Mink alleged that the warrant used to search and seize his property lacked both probable cause and particularity.

1. Probable Cause

The first question is whether there was probable cause to believe that Mr. Mink’s publication of The Howling Pig violated the Colorado criminal libel statute. “The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.” Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (internal quotation marks omitted). “Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place.” United States v. Grubbs, 547 U.S. 90, 95, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006). Mr. Mink alleged that the warrant lacked probable cause because no reasonable prosecutor could have believed that publishing The Howling Pig constituted a crime.
Probable cause exists if “facts and circumstances within the officers’ knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.” Bowling, 584 F.3d at 969 (quoting Brinegar, 338 U.S. at 175-76, 69 S.Ct. 1302 (internal quotation marks omitted)); see also York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir.2008). The question therefore becomes whether a government official of reasonable caution, having reviewed the affidavit and the editorial column of The Howling Pig, would believe that this publication was libelous.
It goes without saying that a government official may not base her probable cause determination on an “unjustifiable *1004 standard,” such as speech protected by the First Amendment. Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (“the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights.”) (internal quotations marks and citations omitted); see also Swiecicki v. Delgado, 463 F.3d 489, 498 (6th Cir.2006) (“an officer may not base his probable-cause determination on speech protected by the First Amendment.”); Sandul v. Larion, 119 F.3d 1250, 1255-56 (6th Cir.1997) (where plaintiffs speech did not constitute fighting words and was thereby protected speech, it could not serve as basis for violation of city ordinances at issue). We thus turn to whether Mr. Mink’s speech was protected by the First Amendment.

a. First Amendment and Defamation

For centuries, the common law has afforded a cause of action to a person whose reputation has been damaged by the publication of false and defamatory statements. Milkovich v. Lorain Journal Co., 497 U.S. 1, 11-12, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (citing L. Eldredge, Law of Defamation 5 (1978)). A passage from Shakespeare’s Othello is often quoted in explanation.
Who steals my purse steals trash ...
But he that filches from me my good name
Robs me of that which not enriches him,
And makes mp poor indeed.
Id. (quoting Act III, scene 3).
Nevertheless, the Supreme Court has recognized a number of constitutional limits on various categories of speech which may be the subject of state defamation actions, see id. at 14-18, 110 S.Ct. 2695, in order to maintain a balance between the protection of one’s individual reputation and the freedom of speech of another person, see id. at 22-23, 110 S.Ct. 2695. After all, “[w]hatever is added to the field of libel is taken from the field of free debate,” New York Times Co. v. Sullivan, 376 U.S. 254, 272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), as well as from “individual liberty” and “the common quest for truth and the vitality of society as a whole.” Hustler Magazine v. Falwell, 485 U.S. 46, 51, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). Moreover,
[t]he First Amendment is not limited to ideas, statements, or positions which are accepted; which are not outrageous; which are decent and popular; which are constructive or have some redeeming element; or which do not deviate from community standards and norms; or which are within prevailing religious or moral standards.... The First Amendment standards are not adjusted to a particular type of publication or particular subject matter.
Pring v. Penthouse Int’l, Ltd., 695 F.2d 438, 443 (10th Cir.1982).
In balancing individual reputation and freedom of speech, the Court has identified various culpability requirements. See generally Milkovich, 497 U.S. at 14-20, 110 S.Ct. 2695. New York Times recognized the need for “a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with ‘actual malice’— that is, with knowledge that it was false or with reckless disregard of whether it was false or not.” Id. at 14, 110 S.Ct. 2695 (quoting New York Times, 376 U.S. at 279-280, 84 S.Ct. 710). The Court extended the New York Times rule to “public figures” in Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d *1005 1094 (1967). In Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court held that although “the New York Times malice standard was inappropriate for a private person attempting to prove he was defamed on matters of public interest,” nevertheless states may not “impose liability without requiring some showing of fault,” or “permit recovery of presumed or punitive damages on less than a showing of New York Times malice.” Milkovich, 497 U.S. at 15-16, 110 S.Ct. 2695 (citing Gertz, 418 U.S. at 344-45, 347-48, 350, 94 S.Ct. 2997).
 As to the “constitutional limits on the type of speech which may be the subject of state defamation actions,” id. at 16, 110 S.Ct. 2695, “the Bresler-Letter Carriers-Falwell line of cases provides protection for statements,” such as parody, fantasy, rhetorical hyperbole, and imaginative expressions, “that cannot ‘reasonably [be] interpreted as stating actual facts’ about an individual,” id. at 20, 110 S.Ct. 2695 (internal citation omitted). Because no reasonable person would take these types of speech as true, they simply cannot impair one’s good name.[7] See id. at 16-17, 110 S.Ct. 2695 (discussing Bresler, 398 U.S. at 13, 90 S.Ct. 1537; Letter Carriers, 418 U.S. at 284, 286, 94 S.Ct. 2770; Falwell, 485 U.S. at 50, 108 S.Ct. 876); see also Falwell, 485 U.S. at 57, 108 S.Ct. 876. “This provides assurance that public debate will not suffer for lack of ‘imaginative expression’ or the ‘rhetorical hyperbole’ which has traditionally added much to the discourse of our Nation.” Milkovich, 497 U.S. at 20, 110 S.Ct. 2695.
To determine whether a statement purports to state actual facts about an individual, the Court scrutinizes the meaning of the statement in context. Id. at 16-17, 110 S.Ct. 2695 (“Rejecting a contention that liability could be premised on the notion that the word ‘blackmail’ implied the developer had committed the actual crime of blackmail, we held that ‘the imposition of liability on such a basis was constitutionally impermissible — that as a matter of constitutional law, the word “blackmail” in these circumstances was not slander when spoken, and not libel when reported in the Greenbelt News Review.’ ”) (quoting Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6, 13, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970)); id. at 17, 110 S.Ct. 2695 (“Use of the word ‘traitor’ in literary definition of a union ‘scab’ not basis for a defamation action under federal labor law since used ‘in a loose, figurative sense’ and was ‘merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members.’”) (quoting Letter Carriers v. Austin, 418 U.S. 264, 284, 286, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974)); Falwell, 485 U.S. at 57, 108 S.Ct. 876 (a state emotional distress “claim cannot, consistently with the First Amendment, form a basis for the award of damages when the conduct in question is the publication of a caricature such as the ad parody involved here.” (emphasis added)). “Context is crucial and can turn what, out of context, appears to be a statement of fact into ‘rhetorical hyperbole,’ which is not actionable.” Ollman v. Evans, 750 F.2d 970, 1000 (D.C.Cir.1984) (en banc) (Bork, J., concurring); see also id. at 983-84.
Even false statements of fact are protected from a defamation claim if any reasonable person would recognize the statements as parody. As the Court held *1006 in Falwell, 485 U.S. at 48, 53-57, 108 S.Ct. 876, an ad parody of the Reverend Jerry Falwell, in which he purportedly stated during an interview that his “first time” was during “a drunken incestuous rendezvous with his mother in an outhouse,” constituted a caricature of him which no one reasonably would consider to be true, even though Reverend Falwell could have proved the assertion of an incestuous relationship with his mother to be absolutely false. See also Oilman, 750 F.2d at 1000 (“It is not unusual to protect false statements of fact where, because of the context, they would have been understood as part of a satire or fiction.”) (Bork, J., concurring and citing Pring, 695 F.2d at 443).
Although the Supreme Court has not yet squarely addressed whether fantasy, parody, rhetorical hyperbole, or imaginative expression is actionable in a case where a plaintiff is neither a public figure nor the speech on a matter of public concern, this circuit and at least one other circuit have done so. In Pring, 695 F.2d 438, we held, “The plaintiff urges that this constitutional doctrine should apply only to public figures, but there is no such limitation....”[8] In Levinsky’s Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122 (1st Cir.1997), the court concluded that a portion of the statements claimed by a private person to be defamatory were constitutionally protected, stating:
The First Amendment’s shielding of figurative language reflects the reality that exaggeration and non-literal commentary have become an integral part of social discourse. For better or worse, our society has long since passed the stage at which the use of the word “bastard” would occasion an investigation into the target’s lineage or the cry “you pig” would prompt a probe for a porcine pedigree. Hyperbole is very much the coin of the modern realm. In extending full constitutional protection to this category of speech, the Milkovich Court recognized the need to segregate casually used words, no matter how tastelessly couched, from fact-based accusations.
Id. at 128. Applying this analysis, the court held that the word “trashy” was hyperbole and therefore shielded from defamation liability notwithstanding the court’s inability to determine whether the context of the statement involved a matter of public concern. See id. at 130, 132-34.
Our holding in Pring, reiterating and applying the test in the context of a private figure on a matter of private concern, is an inevitable explication of the focal point of the Court’s analysis in Bresler, 398 U.S. at 13, 90 S.Ct. 1537, and Letter Carriers, 418 U.S. at 284, 286, 94 S.Ct. 2770. See Pring, 695 F.2d at 440-43 (stating that its holding “is clearly the message in Greenbelt [Bresler ] and Letter Camers.”). Pring emphasized that in all eases involving fantasy, parody, rhetorical hyperbole, or imaginative expression, the constitutional inquiry in deciding whether a statement is actionable remains the same: whether the charged portions, in context, could be reasonably understood as describing actual facts about the plaintiff or actual events in which he participated. Id.; see also Falwell, 485 U.S. 46, 50, 108 S.Ct. 876 (without taking plaintiffs public figure status into account in reaching its conclusion, the Court declined to attach liability where “speech could not reasonably have been interpreted as stating actual facts about *1007 the public figure involved.”); Bresler, 398 U.S. 6, 14, 90 S.Ct. 1537 (same, declining to attach liability where “even the most careless reader must have perceived that the word was no more than rhetorical hyperbole.”); Letter Carriers, 418 U.S. at 285, 94 S.Ct. 2770 (same, declining to attach liability, and finding it “impossible to believe that any reader ... would have understood the newsletter to be charging the appellees with committing the criminal offense of treason.”); Levinsky’s, 127 F.3d at 127-34 (segregating the constitutionally actionable and non-actionable statements about a private plaintiff and addressing the “public concern” issue only as to the actionable category in determining whether there were any constitutional limitations on recoverable damages). This makes sense because if a statement of fact is clearly a spoof, or satirical as in Falwell, it matters not if the outrageously stated facts are false because no one would believe them to be true.[9]
The test of what a particular statement could reasonably be understood to have asserted is what a reasonable reader would understand the author to be saying, considering the kind of language used and the context in which it is used. See Milkovich, 497 U.S. at 16-20, 110 S.Ct. 2695; Bresler, 398 U.S. at 14, 90 S.Ct. 1537 (“[E]ven the most careless reader must have perceived that the word was no more than rhetorical hyperbole.... ”); Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918) (“A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.”).
Following this path, we held in Pring:
The test is not whether the story is or is not characterized as “fiction,” “humor,” or anything else in the publication, but whether the charged portions in context could be reasonably understood as describing actual facts about the plaintiff or actual events in which she participated. If it could not be so understood, the charged portions could not be taken literally. This is clearly the message in Greenbelt and Letter Carriers.
695 F.2d at 442. We also noted that whether a statement could be reasonably understood as fact is a question of law. Id. (“Justice White in his concurrence in Greenbelt suggests that [the question of reasonableness] was there a jury question. The majority, however, regarded it as a matter of law.”). Other courts agree that “Pring appropriately sets the standard for liability in cases of satire or parody.” New Times, Inc. v. Isaacks, 146 S.W.3d 144, 156 (Tex.2004); id. (collecting cases);[10] id. *1008 (stating that in “Falwell, the district court incorporated the Pring test into the jury instructions on Falwell’s libel claim,” resulting in the jury’s finding that “the Hustler ad parody could not ‘reasonably be understood as describing actual facts about [respondent] or actual events in which [he] participated.’ ”) (citing Falwell, 485 U.S. at 52, 57, 108 S.Ct. 876; Milkovich, 497 U.S. at 20, 110 S.Ct. 2695). We apply these tests to the references to Professor Peake in The Howling Pig.

b. Junius Puke Is a Parody of Professor Peake

The dispositive question is whether a reasonable person would conclude that the statements in The Howling Pig were actual statements of fact about Mr. Peake, or attributable to him, rather than a satirical spoof. For the reasons stated below, we conclude that the answer is no.
As we have noted, The Howling Pig humorously altered Mr. Peake’s photograph to create the character of Junius Puke, its “editor.” Another photo was altered to depict Mr. Peake/Puke made up as a character in the rock band KISS. Junius Puke covered subjects and used language that Mr. Peake, a professor of finance, surely would not have. For example, the editorial said:
This will be a regular bitch sheet that will speak truth to power, obscenities to clergy, and advice to all the stoners sitting around watching Scooby Doo.
This will be a forum for the pissed off and disenfranchised in Northern Colorado, basically everybody.
I made it to where I am through hard work, luck, and connections, all without a college degree.
Dissatisfaction with a cushy do-nothing ornamental position led me to form this subversive little paper.
I don’t normally care much about the question of daycare since my kids are grown and other people’s children give me the willies[.]
ApltApp., vol. I at 147-48. Significantly, The Howling Pig editorials even contained an express disclaimer regarding the editor:
*1009 The Howling Pig would like to make sure that there is no possible confusion between our editor Junius Puke and the Monfort Distinguished Professor of Finance, Mr. Junius “Jay” Peake. Mr. Peake is an upstanding member of the community as well as an asset to the Monfort School of Business where he teaches about microstructure. Peake is active in many community groups, married and a family man. He is nationally known for his work in the business world, and has consulted on questions of market structure. Junius Puke is none of those things and a loudmouth know-it-all to boot, but luckily he’s frequently right and so is a true asset to this publication.
Id. at 146. According to the search warrant affidavit itself:
The picture [of Junius Peake] has been altered to include sunglasses, a smaller nose and a small moustache similar to that of Hitler’s. The person in the photograph is identified on the website as Junius Puke. The picture is accompanied by a biography of Mr. Puke. According to the site, its purpose is to draw attention to issues rampant in Northern Colorado and Elsewhere [sic].
Ex. B at 3.
Balanced against all this, Detective Warren provided Mr. Peake’s complaint to him as the sole basis of the alleged defamatory content articulated in the affidavit. Thus, the affidavit said that “[Mr. Peake] told Detective Warren that the statements made on the website about him are false.” Id. When asked to provide some examples, Mr. Peake cited the following:
1) The website uses his photograph and identifies him as the Editor in Chief Junius Puke.
2) The website states that he “gambled in tech stocks” in the 90’s.
3) The website states: The dark glasses are to avoid being recognized since he fears the good natured ribbing of his colleagues on Wall Street where he managed to luck out and ride the tech bubble of the nineties like a $20 whore and make a fortune.
4) The website contains many opinions and articles about The University of Northern Colorado, the Greeley Community and Northern Colorado. As this is an “editorial” column, those statements are attributed to Mr. Puke, and therefore Mr. Peak [sic]. Mr. Peak [sic] feels that these opinions are not his but have been attributed to him.
Id. at 3-4.
The test is not how Mr. Peake would characterize The Howling Pig’s editorial column, but how a reasonable person would understand those statements in that context. See Pring, 695 F.2d at 442. In our judgment, the district court reached the only possible conclusion in its January 9, 2004 order granting the temporary restraining order. “[Wjhat’s written in this case is satire.... [A]s written it is crass and vulgar, but that makes it no less protected by the First Amendment.” Aplt. App., vol. II. at 589-90. “[T]his is the purest of speech which has been tolerated by all but tyrants and despots from ancient times.” Id. at 590. It is apparent from our review of the charged portions of the column on the editorial page of The Howling Pig that no reasonable reader would believe that the statements in that context were said by Professor Peake in the guise of Junius Puke, nor would any reasonable person believe they were statements of fact as opposed to hyperbole or parody. The comments asserted as defamation constituted satire in its classic sense. As such, they are protected speech under the First Amendment, and a state may not deem them to constitute libel, particularly *1010 criminal libel. See Milkovich, 497 U.S. at 16-17, 110 S.Ct. 2695 (quoting Bresler, 398 U.S. at 13, 90 S.Ct. 1537). The district attorney recognized as much when he concluded that The Howling Pig could not be prosecuted under the statute. See Mink I, 482 F.3d at 1250.
Because a reasonable person would not take the statements in the editorial column as statements of facts by or about Professor Peake, no reasonable prosecutor could believe it was probable that publishing such statements constituted a crime warranting search and seizure of Mr. Mink’s property.

2. Particularity Requirement

Mr. Mink also alleged that the warrant used to search and seize his property lacked the particularity required by the Fourth Amendment. The district court agreed,- stating that “[u]nder the ‘scrupulous’ standard required by the Supreme Court [for seizures of books and other materials protected by the First Amendment], I have no doubt the warrant in . this case was overly broad.” Mink II, 566 F.Supp.2d at 1228. Ms. Knox challenges the district court’s conclusion.
The Fourth Amendment requires that a search warrant describe with particularity the things to be seized in order to avoid a general exploratory rummaging of a person’s belongings. United States v. Campos, 221 F.3d 1143, 1147 (10th Cir. 2000). The particularity requirement was included in the Fourth Amendment as a response to the evils of general warrants. See id. It “ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause.” Foss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir.1985) (emphasis added). “As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.” United States v. Janus Indus., 48 F.3d 1548, 1553 (10th Cir.1995) (quoting Stanford v. Texas, 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965)).
A warrant is overly broad if it does not contain sufficiently particularized language that creates a nexus between the suspected crime and the items to be seized. See Campos, 221 F.3d at 1147; United States v. Grimmett, 439 F.3d 1263, 1271 (10th Cir.2006). In United States v. Otero, 563 F.3d 1127 (10th Cir.2009), we recognized that
[t]he modern development of the personal computer and its ability to store and intermingle a huge array of one’s personal papers in a single place increases law enforcement’s ability to conduct a wide-ranging search into a person’s private affairs, and accordingly makes the particularity requirement that much more important. See, e.g. United States v. Riccardi, 405 F.3d 852, 863 (10th Cir. 2005) (warrant authorizing general search of computer invalid as it permitted officers to search anything “from child pornography to tax returns to private correspondence”); United States v. Carey, 172 F.3d 1268, 1272 (10th Cir. 1999) (computer search for files pertaining to distribution of controlled substances uncovered child pornography).
Id. at 1132. We therefore held that “warrants for computer searches must affirmatively limit the search to evidence of specific ... crimes....” Id. (quoting Riccardi, 405 F.3d at 863 (emphasis added)).
Here, there was no reference anywhere in the warrant to any particular crime, much less to the Colorado criminal libel statute. See Ex. A. The only reference to a crime in the entire warrant was a citation to a portion of the Colorado Rule of Criminal Procedure 41(b), which specified generally:
*1011 A search warrant may be issued under this Rule to search for and seize any property:
(1) Which is stolen or embezzled; or
(2) Which is designed or intended for use as a means of committing a criminal offense; or
(3) Which is or has been used as a means of committing a criminal offense; or
(4) The possession of which is illegal; or
(5) Which would be material evidence in a subsequent criminal prosecution in this state or in another state ...
Colo. R.Crim. P. 41(b) (2003) (emphasis added).
The warrant authorized the search and seizure of all computer and non-computer equipment and written materials in Mr. Mink’s house, without any mention of any particular crime to which they might be related, essentially authorizing a “general exploratory rummaging” through Mr. Mink’s belongings for any unspecified “criminal offense.” See Campos, 221 F.3d at 1147; see also Cassady, 567 F.3d at 637 (holding that a warrant permitting “search for all evidence of any crime [is] invalid.”).[11] No paragraph tied the listed items to any particular crime. The warrant was therefore clearly invalid under the particularity clause of the Fourth Amendment.
Based on the foregoing, viewing the amended complaint in the light most favorable to the nonmoving party, Mr. Mink, and drawing all reasonable inferences in his favor, see Archuleta, 523 F.3d at 1282-1283, we conclude the complaint plausibly alleged that Ms. Knox violated Mr. Mink’s constitutional right not to be served with an overbroad warrant lacking any particularity.
C.
The Law Was Clearly Established at the Time the Alleged Violations Occurred
The prong of the qualified immunity test requiring that the law be clearly established is easily satisfied here. Ms. Knox’s review of the affidavit and warrant occurred in December 2003. Long before that, it was clearly established in this circuit that speech, such as parody and rhetorical hyperbole, which cannot reasonably be taken as stating actual fact, enjoys the full protection of the First Amendment and therefore cannot constitute the crime of criminal libel for purposes of a probable cause determination. Pring, 695 F.2d at 442. Moreover, it was also clearly established that warrants must contain probable cause that a specified crime has occurred and meet the particularity requirement of the Fourth Amendment in order to be constitutionally valid. Voss, 774 F.2d at 404 (“The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause.”)
Ms. Knox insists that this case is factually analogous to Douglas v. Dobbs, 419 F.3d 1097 (10th Cir.2005), cert. denied, 546 U.S. 1138, 126 S.Ct. 1147, 163 L.Ed.2d 1001 (2006), thereby meriting the conclusion that the law was not clearly established that her conduct violated the Constitution. We disagree. In Douglas, an assistant district attorney (ADA) authorized a police officer to seek a warrant to conduct an investigatory search of the plaintiffs pre *1012 scription drug records. Because we concluded the plaintiff “failed to demonstrate that the ADA violated a clearly established constitutional right,” id. at 1099, 1103, we held that she was entitled to qualified immunity. Id. Unlike in Douglas, the constitutional rights Mr. Mink relies on were clearly established in this circuit at the time of Ms. Knox’s conduct.
III.
In sum, we conclude the amended complaint plausibly alleged that Ms. Knox violated Mr. Mink’s clearly established constitutional rights. Accordingly, we REVERSE the district court’s decision granting Ms. Knox’s motion to dismiss and REMAND for further proceedings consistent with this opinion.

. The facts are taken primarily from our previous decision in Mink v. Slithers, 482 F.3d 1244, 1249-1251 (10th Cir.2007), cert. denied, 552 U.S. 1165, 128 S.Ct. 1122, 169 L.Ed.2d 949 (2008) ("Mink I"), and the district court's decision on remand in Mink v. Knox, 566 F.Supp.2d 1217, 1220 (D.Colo.2008) ("Mink II ”). We also quote from the amended complaint.

. Ms. Knox admitted in an affidavit submitted on March 8, 2004, that she reviewed the warrant as well as the search warrant affidavit.

. Mr. Mink also removed the City of Greeley and Officer Warren, and added Ken Salazar in his official capacity as Attorney General of Colorado.

. We may consider the two parts of this test in the sequence we deem best in light of the circumstances in the particular case. See Pearson v. Callahan, - U.S. -, -, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

. In Ashcroft v. Iqbal, - U.S. -, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court held in a Bivens action alleging unconstitutional discrimination that "each Government official ... is only liable for his or her own misconduct." Id. at 1949. The Court’s dissenters viewed this pronouncement as "eliminating ... supervisory liability entirely.” Id. at 1957 (Souter, J., dissenting). We noted both views in Lewis v. Tripp, as well as the fact that they have "generated significant debate about the continuing vitality and scope of supervisory liability, not only in Bivens actions, but also in § 1983 suits.” 604 F.3d 1221, 1227 n. 3 (10th Cir.2010) (citing al-Kidd v. Ashcroft, 580 F.3d 949, 976 n. 25 (9th Cir.2009), and Sheldon Namod, Constitutional Torts, Over-Detetrence and Supervisory Liability after Iqbal, 14 Lewis & Clark L.Rev. 279, 294-98 (2010)). See also T.E. v. Grindle, 599 F.3d 583, 588-89 (7th Cir.2010) (holding plaintiffs' claims withstand Iqbal where there is evidence that the supervisor "knew about [her subordinate’s] abuse of the girls and deliberately helped cover it up,” permitting a jury to reasonably infer "that [the supervisor] also had a purpose of discriminating against the girls based on their gender”) (citation omitted).
We found it unnecessary in Lewis to take a position on the debate, and we need not do so here. Mr. Mink has pled sufficient facts to state a facially plausible claim that Ms. Knox’s input into and advice concerning the affidavit and warrant directly caused the purportedly unconstitutional search of his house. Our precedent and Iqbal lead to the same result because we rely on Poolaw and Snell’s legal standard of liability for defendant's personal participation, not for supervisory liability

. The statute provides:
(1) The district attorneys of the several judicial districts in the state of Colorado shall: (a) Render ... legal advice to peace officers, upon the request of such officers or of the court, pertaining to the preparation and review of affidavits and warrants for arrests, searches, seizures, ...
Colo.Rev.Stat. § 20-1-106.1 (emphasis added).

. Civil and criminal libel cases "are subject to the same constitutional limitations.” Herbert v. Lando, 441 U.S. 153, 157 n. 1, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (citing Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)).

. Thus, the district court was incorrect when it slated that “the question of whether this 'opinion, parody, and hyperbole' exception extends to statements about private figures on matters of private concern does not appear to be resolved in this circuit.” Mink II, 566 F.Supp.2d at 1226. Pring, 695 F.2d at 442, has settled this matter.

. Accordingly, if we determine that the charged portions of The Howling Pig would not have been reasonably believed to be true statements about Professor Peake, it is not relevant to our analysis whether Mr. Peake was a public figure or speaking on a matter of public concern. See Pring, 695 F.2d at 442. For purposes of the probable cause analyáis in this case, therefore, our inquiry ends if we determine that the charged portions of The Howling Pig could not be libelous — that is, could not reasonably be taken as true.

. Isaacks cites to other courts' opinions that have adopted variations of the Pring test:
Dworkin v. Hustler Magazine, Inc., 867 F.2d 1188, 1193-94 (9th Cir.1989) (Hustler features mentioning Dworkin’s name in a derogatory fashion were “privileged opinion” because they could not be "reasonably understood as statements of fact.”); San Francisco Bay Guardian, Inc. v. Superior Court, 17 Cal.App.4th 655, 21 Cal.Rptr.2d 464, 467 (1993) (average reader would recognize phony letter to the editor as “a fake and a joke”); Walko v. Kean College, 235 N.J.Super. 139, 561 A.2d 680, 683 (1988) ("A parody or spoof that no reasonable person would read as a factual statement, or as anything other than a joke — albeit a bad joke — cannot be actionable as a defama *1008 lion.”) (citing Pring); Myers v. Boston Magazine Co., Inc., 380 Mass. 336, 403 N.E.2d 376, 379 (1980) (reasonable reader would not understand satire to state actual fact); Garvelink v. Detroit News, 206 Mich.App. 604, 522 N.W.2d 883, 886 (1994) (As a matter of law, satirical article could not “reasonably be interpreted as stating actual facts about the plaintiff and ... is, therefore, protected speech.”); Hoppe v. Hearst Corp., 53 Wash.App. 668, 770 P.2d 203, 206 (1989) (adopting Pring test and holding that parody was non-actionable as a matter of law).
Isaacks, 146 S.W.3d at 156-158; see also Browning v. Clinton, 292 F.3d 235, 248 (D.C.Cir.2002) (" 'Hyperbole' is protected from defamation claims due to the 'constitutional protection afforded to parody, satire, and other imaginative commentary' ”) (quoting Moldea v. New York Times Co., 22 F.3d 310, 313 n. 2, 314 (D.C.Cir.1994)); Hamilton v. Prewett, 860 N.E.2d 1234, 1244-45 (Ind.Ct. App.2007) (“[P]arody and defamation are two separate classes of speech: 'defamation' is speech that is a false statement of fact and 'parody' is speech that one cannot reasonably believe to be fact because of its exaggerated nature.”); Victoria Square, LLC v. Glastonbury Citizen, 49 Conn.Supp. 452, 891 A.2d 142, 145 (2006) (“[d]efamation is, by its nature, mutually exclusive of parody ... [a] false statement that is published as a parody cannot be defamatory”); Kiesau v. Bantz, 686 N.W.2d 164, 176-77 (Iowa 2004) (referring to parody as an "affirmative defense” to plaintiff's defamation claim); Stien v. Marriott Ownership Resorts, Inc., 944 P.2d 374, 380 (Utah Ct.App.1997) ("[a] parody or spoof that no reasonable person would read as a factual statement, or as anything other than a joke[,] cannot be actionable as a defamation”) (quoting Walko, 561 A.2d at 683); 50 Am.Jur.2d Libel and Slander § 156 ("Defamation is by its nature mutually exclusive of parody.”).

. The amended complaint alleged that this is exactly how the officer executing the warrant read it: "Detective Warren [told Mr. Mink] that he could take ‘everything in the house' if he wanted.” Aplt.App., vol. I at 108.